IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:14-CR-38-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| VICTORIA SHEPHERD WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court in furtherance of oral rulings made on defendant's objections to her offense conduct level calculation at time of sentencing December 9, 2014.

## BACKGROUND

On June 12, 2014, defendant pleaded guilty, pursuant to a written plea agreement, to a one count criminal information, wherein she was charged with mail fraud in violation of 18 U.S.C. § 1341. The United States Probation Office calculated defendant's criminal history category as level I and her offense level as 32. Based on the foregoing calculations, the advisory United States Sentencing Guidelines recommended a term of imprisonment of 121-151 months.

As pertinent here, beginning in or around 2005, defendant, then the chief financial officer of her family's now-defunct business, East Carolina Equipment Company ("ECE"), began using the names and social security numbers of family members and ECE customers to open fraudulent lines of credit with Kubota Credit Corporation ("KCC"). KCC, a captive financing company, is a wholly owned subsidiary of Kubota Tractor Corporation and provides financing for such tractors, parts, and other farm equipment.

ECE was an authorized retailer of Kubota tractors. KCC loaned money to purchasers of Kubota equipment from authorized retailers. In particular, KCC allowed borrowers to obtain financing through use of Retail Installment Contracts ("RIC"). An RIC operates much like a credit card. ECE customers would apply for an RIC and, if approved, would be extended a line of credit on which they could make purchases of Kubota equipment. ECE collected the borrower's initial information and forwarded that information to KCC. KCC would then approve or deny the application, and ECE would become the initial lender on the loan. Thereafter, KCC purchased the loans from ECE.

In her position as ECE's chief financial officer, defendant had access to the names and social security numbers of ECE customers who previously had applied for an RIC. Over the span of four years, defendant created a sophisticated fraud scheme affecting not only KCC but one other financial institution and sixty-three individual victims. In large part, the scheme involved opening an accounts in existing customers' names and submitting fraudulent invoices to KCC for parts not sold or services not rendered. Occasionally, defendant would submit an invoice to KCC, receive payment on behalf of ECE, and subsequently cancel the original invoice as being sent "in error." However, defendant thereafter would resubmit the invoice, causing KCC to pay ECE twice for the same fraudulent transaction.

Defendant went to great lengths to conceal her fraud. Defendant made payments on fraudulent RICs in an attempt to defray KCC's attention. The fraud operated similarly to a Ponzi scheme, each time payment was due on a fraudulently establish RIC, defendant would use money obtained from another RIC to satisfy the debt. Additionally, defendant took steps to prevent her victims from learning of the RICs opened in their names. After opening a United States Post Office

box, defendant changed the address associated with each account to the P.O. box. As a result, all correspondence regarding the RICs was routed through defendant's P.O. box rather than to individual victims. Defendant intended to cause KCC a loss of $1,726,772.06.

During the same four year span, defendant also used the name and social security number of an ECE customer to defraud Wells Fargo Bank ("Wells Fargo"). Defendant submitted a loan application to Wells Fargo using a fraudulently obtained identity, which was approved. Through defendant's actions, Wells Fargo suffered a loss of $86,136.55.

## DISCUSSION

Defendant objects to her offense conduct level calculation on four grounds. The court addresses each of these objections in turn.

### A. Abuse of a Position of Trust

Defendant contends a two level enhancement for abuse of a position of trust (the "Trust adjustment"), under U.S.S.G. § 3B1.3, constituted impermissible double counting as the conduct punished by the Trust adjustment is already covered by a four-level enhancement for an offense involving "50 or more victims but less than 250" under U.S.S.G. § 2B.1(b)(2)(B). The Trust adjustment may not be applied if another enhancement punishes the relevant aspect of defendant's conduct. Id. § 3B1.3.

Defendant's offense affected more than 50 victims. Under the sentencing guidelines, "victim" means "any person who sustained any part of the actual loss" caused by the offense. U.S.S.G. § 2B1.1 n.1. In addition, where "means of identification" are involved, "victim" also includes "any individual whose means of identification was used unlawfully or without authority."

3

Id. at n.4(E). A "means of identification" is any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual. 18 U.S.C. § 1028(d)(7).

In the instant case, KCC and Wells Fargo properly are considered victims because they shared the "actual loss" caused by defendant's conduct. Additionally, the 66 individuals whose names and Social Security numbers fraudulently were used by defendant to obtain loans are victims because defendant used such means of identification without their consent.

The Trust adjustment also clearly applies. As provided for in the guidelines, the Trust adjustment "shall apply . . . [when] a[] defendant . . . exceeds or abuses the authority of his or her position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification." U.S.S.G. § 3B1.3 n.2(B); see also United States v. Abdelshafi, 582 F.3d 602, 611 (4th Cir. 2010). In this case, defendant abused her position as chief financial officer of ECE to obtain unlawfully customers' means of identification.

The court now turns to defendant's argument that the four-level enhancement for having fifty or more victims and the Trust adjustment punish the same relevant aspect of conduct. While the victim enhancement and Trust adjustment are triggered by the same conduct, they are intended to punish different aspects of such conduct. In particular, the victim enhancement punishes the number of victims harmed. Trust adjustment, however, punishes the use of a position of trust to "significantly facilitate[] the commission or concealment of" a crime, and accordingly provides for a more stern punishment, rather than the harm caused. U.S.S.G. § 3B1.3. The Trust adjustment is recognition, by the advisory Guidelines, that a crime escalates in severity where a position of trust is abused.

4

While the Fourth Circuit has not addressed application of the Trust adjustment to facts analogous to those presented by this case, other courts have held that the Trust adjustment may be properly applied if "abuse of a position of trust" is not "a factor in the guideline base offense level or specific offense characteristics." United States v. Queen, 4 F.3d 925, 928 (10th Cir. 1993); see also United States v. Georgiadis, 933 F.2d 1219, 1225 (3d Cir. 1991) (reasoning that while embezzlement always involves breach of duty of trust, it does not always involve abuse of position of trust).

Under that test, both the victim enhancement and Trust adjustment may be applied in this case. As relevant here, defendant pleaded guilty to mail fraud. In the course of her mail fraud, she used her position as chief financial officer to take and misuse the identity of 66 people. The criminal act constituting mail fraud does not require defendant occupy a position of trust. Application of the Trust adjustment stems from defendant's use of her position as ECE's chief financial officer to accomplish her crime. By granting her easy access to, and a lack of oversight in the handling of, customer's personal information, her position significantly facilitated the commission and concealment of the crime.

**B.      Sophisticated Means**

Next, the court turns to defendant's objection regarding the application of the sophisticated means enhancement. U.S.S.G .§ 2B1.1(b)(10)(C). Defendant contends her actions, which she characterizes as "forging signatures and opening a United States Post Office Box," do not constitute a sophisticated scheme.

The "sophisticated means" enhancement applies where defendant employs "especially complex or intricate offense conduct pertaining to the execution or concealment of an offense." Id.

5

§ 2B1.1(b)(10)(C) n.9(B). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities . . . ordinarily indicates sophisticated means." Id. However, application of the sophisticated means enhancement does not require the court to find "the existence of highly complex schemes or exceptional brilliance to justify" its imposition. United States v. Adepoju, 756 F.3d 250, 258-59 (4th Cir. 2014) (internal citations and quotations omitted). The court simply must find defendant's conduct, when viewed as a whole, was more complex than "garden variety" conduct constituting the same offense. See id.

Forging signatures, opening false accounts, and taking steps to make a crime difficult to detect are all elements of a complex scheme. See, e.g., United States v. Mendez, ___ F. App'x ___, 2014 WL 5786649, at *2 (4th Cir. Nov. 7 2014) (upholding application of the enhancement when defendant obtained 198 credit card numbers and then disguised his fraudulent purchases, making them appear as legitimate transactions); United States v. Noel, 502 F. App'x 284, 290 (4th Cir. 2012) (upholding application of the enhancement where defendant made numerous misrepresentations to conceal his fraud from investors); United States v. McCormick, 208 F. App'x 246, 248 (4th Cir. 2006) (upholding application of the enhancement where defendant opened at least 40 accounts at various financial institutions, insurance companies, and brokerage houses, where he could deposit the money and rerouted a line of corporate credit, which he was instructed to close, to his personal address to prevent detection).

In this case, defendant used her financial knowledge to further a sophisticated scheme. Defendant's conduct persisted over the course of four years. Defendant opened accounts in existing customers' names and submitted fraudulent invoices to KCC for parts or services not sold.

6

Occasionally, she would cancel invoices after receiving payment only to resubmit it, causing KCC to pay ECE twice for the same fraudulent transaction.

Defendant went to great lengths to conceal her fraud. She made payments on fraudulent RICs using money obtained from other fraudulent RICs. Additionally, defendant took steps to prevent her victims from learning of the RICs opened in their names. After opening a United States Post Office box ("P.O. box"), defendant changed the address associated with each account to the P.O. box. As a result, all correspondence regarding the RICs was routed through defendant's P.O. box rather than to the individual victim. Defendant intended to cause KCC a loss of $1,726,772.06.

During the same four year span, defendant also used the name and social security number of an ECE customer to defraud Wells Fargo Bank ("Wells Fargo"). Defendant submitted a loan application to Wells Fargo using a fraudulently obtained identity, which was approved. Through defendant's actions, Wells Fargo suffered a loss of $86,136.55.

Defendant argues her conduct constituted a "garden variety" mail fraud scheme and, thus, the enhancement should not apply. However, as discussed above, defendant not only used the United States mail to defraud KCC and Wells Fargo but also used a false Post Office box to conceal her crimes from her victims. She simply did not induce victims to mail her funds. Rather, she used her false Post Office box as a repository for correspondence with both companies to ensure the remainder of her victims never learned of her crime. Moreover, she opened a substantial number of accounts and used her knowledge of KCC's inner workings to maximize her gains therefrom. In sum, defendant's mail fraud evidenced a level of sophistication and complexity warranting a two level offense conduct enhancement. Defendant's objection is overruled.

7

**C.      Using Means of Identification to Obtain Means of Identification**

The court next turns to defendant's third argument, which closely mirrors her first. Defendant contends that application of both U.S.S.G. § 2B1.1(b)(11)(C)(i) (the "Production enhancement") and § 3B1.3, the Trust adjustment, impermissibly punishes the same conduct. As previously discussed, the Trust adjustment may not apply where the relevant aspect of the conduct constituting an abuse of a position of trust has already been punished under some other guideline. Id. § 3B1.3. The Production enhancement provides for a two level increase if the offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." U.S.S.G. § 2B1.1(b)(11)(C)(i).

A "means of identification" is "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual. 18 U.S.C. § 1028(d)(7). Means of identification include names, social security numbers, date of birth, driver's license or identification numbers, unique electronic identification numbers, unique electronic addresses, or unique electronic routing codes. Id.

Here, defendant used a means of identification to produce or obtain another means of identification. The guidelines specifically contemplate the factual scenario presented here. The Production enhancement applies if "a defendant obtains an individual's name and social security number from a source . . . and obtains a bank loan in that individual's name." U.S.S.G. § 2B1.1(b)(11)(C)(i) n.10(c)(ii)(I). In that example, the bank loan is the other means of identification obtained. Id. The Production enhancement is applicable here because defendant used numerous victim's means of identification to obtain financing from KCC or, on one occasion, a loan from Wells Fargo.

8

Also as noted above, the Trust adjustment is intended to punish abuse of a position that "significantly facilitated the commission or concealment of the offense." Id. § 3B1.3. The Trust adjustment may be properly applied if "abuse of a position of trust" is not "a factor in the guideline base offense level or specific offense characteristics." United States v. Queen, 4 F.3d 925, 928 (10th Cir. 1993); see also United States v. Georgiadis, 933 F.2d 1219, 1225 (3d Cir. 1991) (reasoning that while embezzlement always involves breach of duty of trust, it does not always involve abuse of position of trust).

Both the Trust adjustment and the Production enhancement may apply here. As discussed, application of the Production enhancement stems from defendant's use of victim's names and social security numbers to obtain financing from KCC and Wells Fargo. Application of this enhancement does not require defendant occupy a position of trust. By contrast, the Trust adjustment applies here because defendant used her position as chief financial officer to accomplish her crime. Her position significantly facilitated the commission and concealment of the crime, as it gave her easy access to the victims' means of identification and allowed her to hide the commission of her crime due to the nature of her position.

**D.      Gross Receipts Exceeding $ 1,000,000.00 from One Financial Institution**

The court now addresses defendant's objection to the application of § 2B1.A(b)(16)(A), which provides for a two level increase where defendant "derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." Defendant argues that the objection constitutes impermissible double counting where the same conduct is punished by a sixteen-level enhancement for causing more than $1,000,000 in loss. The court sustains defendant's objection, albeit on different grounds.

9

Financial institution is a term of art defined by 18 U.S.C. § 20. That statute provides the term "financial institution" means:

> (1) an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act);
> (2) a credit union with accounts insured by the National Credit Union Share Insurance Fund;
> (3) a Federal home loan bank or a member, as defined in section 2 of the Federal Home Loan Bank Act (12 U.S.C. 1422), of the Federal home loan bank system;
> (4) a System institution of the Farm Credit System, as defined in section 5.35(3) of the Farm Credit Act of 1971;
> (5) a small business investment company, as defined in section 103 of the Small Business Investment Act of 1958 (15 U.S.C. 662);
> (6) a depository institution holding company (as defined in section 3(w)(1) of the Federal Deposit Insurance Act;
> (7) a Federal Reserve bank or a member bank of the Federal Reserve System;
> (8) an organization operating under section 25 or section 25(a) of the Federal Reserve Act;
> (9) a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978); or
> (10) a mortgage lending business (as defined in section 27 of this title) or any person or entity that makes in whole or in part a federally related mortgage loan as defined in section 3 of the Real Estate Settlement Procedures Act of 1974.

Id.

At sentencing, the government presented no evidence to support application of U.S.S.G. § 2B1.A(b)(16)(A). In fact it contended it did not apply, where there is no evidence that KCC is a "financial institution" as defined by 18 U.S.C. § 20. Where the court cannot conclude that defendant gained more than $1,000,000.00 from a financial institution as is required by the advisory Sentencing Guidelines, the court sustains defendant's objection.

## CONCLUSION

Based on the foregoing, defendant's objections one, two, and three are overruled. Defendant's fourth objection is sustained.

10

SO ORDERED, this the 29th day of December, 2014.

_____
LOUISE W. FLANAGAN
United States District Judge